OPINION OF THE COURT
Kaye, J.
 After a jury trial, defendant was convicted of murder in the first degree and sentenced to death. This direct appeal as of right by defendant (NY Const, art VI, § 3, subd b; CPL 450.70, subd 1), the lone resident of New York’s death row, presents three questions: (1) whether the evidence was sufficient to prove his guilt beyond a reasonable doubt; (2) whether alleged trial errors deprived him of a fair trial; and (3) whether the State’s mandatory death sentence (Penal Law, § 60.06) for one convicted of murder while “confined in a state correctional institution * * * upon a sentence for an indeterminate term the minimum of which was at least fifteen years and the maximum of which was natural life” (Penal Law, § 125.27, subd 1, par [a], cl [iii]) is constitutional. We conclude that the evidence was sufficient to prove defendant’s guilt beyond a reasonable doubt and that the court below committed no reversible error in the conduct of the proceedings. We also conclude, however, that New York’s mandatory death penalty law is unconstitutional. For these reasons we modify the judgment by vacating the sentence of death and remitting the case to the Supreme Court, Dutchess County, for resentencing and, as so modified, we affirm the judgment.
In May 1981, Donna Pay ant was employed as a corrections officer at the Green Haven Correctional Facility in Stormville, New York, where defendant was serving an indeterminate sentence of 25 years to life.[1] Some time after reporting for work on the afternoon of May 15, 1981, *51 Payant disappeared. Her body was discovered the next morning at a landfill in Amenia, New York, when refuse from Green Haven was dumped and examined. An autopsy revealed that she had died of ligature strangulation.
Three weeks later, an information was filed in Beekman Town Court accusing defendant of Payant’s murder and charging him with violation of section 125.27 of the Penal Law, a felony which mandates a sentence of death upon conviction. The Dutchess County Grand Jury indicted defendant in October 1981. Because of a potential conflict involving the Dutchess County District Attorney’s office, a Special District Attorney was appointed by the court, and at a later date defendant’s present counsel were appointed pursuant to article 18-B of the County Law. Defendant’s pretrial motions to dismiss the indictment, for recusal of the Trial Judge, and for a change of venue were denied.
Defendant’s trial commenced in January 1983. On April 21,1983, after three days’ deliberation, the jury returned a verdict of guilty. Defendant’s motion to set aside that verdict was denied, and on June 10,1983 he was sentenced to death. This appeal followed.
The People’s case consisted of circumstantial evidence showing that Payant’s known movements at Green Haven on May 15, 1981 brought her to an area near the Catholic Chaplain’s office, where defendant worked that day, that Payant and defendant had previously spoken, that Payant and defendant were observed entering the Catholic Chaplain’s office together on the day of her disappearance, and that defendant had access to a room (the library of the Chaplain’s office) to which he could have lured Payant and killed her in relative seclusion, to materials (cord, plastic bags and masking tape) similar to those with which she was killed and her body was wrapped, and to vehicles (a large waste drum, a cart for moving refuse, and trash dumpsters) for disposal of her body. The People also introduced testimony of an inculpatory admission defendant made to a fellow inmate approximately one year after Payant’s death, and expert testimony that a premortem wound on Payant’s chest was a bite mark made by defendant.
Defendant at trial showed that several corrections officers had made prior statements that Payant had been seen *52 at various points of the institution on May 15 after the alleged time of her murder, and that the investigation of Payant’s death had produced no evidence — save the bite mark — connecting defendant to Payant’s murder. The defense introduced its own expert testimony to show that the mark on Payant’s body could not be attributed to defendant, and indeed that it was not even a bite mark.
As discussed in the ensuing sections, we conclude that defendant’s guilt was established beyond a reasonable doubt, that there was no reversible error in the conduct of the trial, and that the mandatory death penalty statute is unconstitutional.
I
On this appeal from a judgment of death, the New York Constitution empowers us to review the facts (NY Const, art VI, §§ 3, 5). The scope of our inquiry has been defined in People v Davis (43 NY2d 17, 36, cert den 435 US 998) and People v Crum (272 NY 348, 350): “A review of the facts means that we shall examine the evidence to determine whether in our judgment it has been sufficient to make out a case of murder beyond a reasonable doubt. We are obliged to weigh the evidence and form a conclusion as to the facts. It is not sufficient, as in most of the cases with us, to find evidence which presents a question of fact; it is necessary to go further before we can affirm a conviction and find that the evidence is of such weight and credibility as to convince us that the jury was justified in finding the defendant guilty beyond a reasonable doubt.” Even in a capital case, however, “this court should not readily interfere with verdicts of jurors who have had the advantage of seeing and hearing witnesses.” (People v Crum, 272 NY 348, 357, supra.)
The People’s theory is that defendant killed Payant in the early afternoon of May 15, 1981 inside the Catholic Chaplain’s office complex, wrapped her body in plastic bags, placed the body in a 55-gallon waste drum, and dumped it into a dumpster maintained for the disposal of trash, from which it was collected and later discovered. Upon our review of the record, we conclude that the evidence supported this theory and was sufficient to make out *53 a case of murder beyond a reasonable doubt. The evidence which in our view justified the jury in finding defendant guilty may be summarized as follows.
Donna Payant began her career at Green Haven some two months before her death. She had spoken with defendant on at least two occasions prior to the date of her disappearance: once when she told him she admired a religious article he had crafted and he in turn told her that he worked in the Chaplain’s office, and a second time when they spoke in an area of Green Haven’s hospital corridor, near the Chaplain’s office, on May 12, 1981. (A diagram of Green Haven is annexed to this opinion.)
On May 15, Payant was scheduled to work the 1:00 to 9:00 p.m. shift, and reported to a lineup to receive her assignments. Her assignments that day were to patrol the A/B yard area, then to escort two companies of inmates from D block to the mess hall for dinner and back, lock those inmates in and conduct a count, and finally to report to the mess hall area at 6:00 p.m. Payant, along with Officers Claude King and Barbara Hinson, after lineup went into the officers’ mess, where she purchased a soft drink, then proceeded back to the westside corridor and headed south toward their assignments. The telephone in the westside corridor rang and Officer Hinson answered it. The caller asked for Payant and Hinson called her to the telephone. Payant was on the telephone briefly and was overheard saying “what,” “who,” “yes,” and “okay.” After hanging up the telephone, Payant told King there was a problem she had to straighten out and that she would be right back, and she headed back down the westside corridor.
Payant passed both the westside control gate and the control station in the hospital corridor, heading east, at about 1:00 p.m. That direction would lead to the Chaplain’s office complex at the other side of the hospital corridor — an area where defendant worked and had been seen that day.
Defendant was a clerk to the Catholic Chaplain. His duties included cleaning the Chaplain’s office complex and emptying the garbage collected there. He also worked in Green Haven’s package room where, once again, his duties *54 included cleaning the area and transporting and dumping the garbage.
On May 15, 1981 the Catholic Chaplain was away from the institution on military leave. When defendant arrived for work there at 8:30 a.m. the officer in the hospital corridor, as he had done before, let him through the control gates and into the Chaplain’s office. After returning to his cell for a count, defendant came back to the Chaplain’s office, which was opened for him again at 12:30 p.m. Defendant was observed by corrections officers in the hospital corridor area near the Chaplain’s office at or about 1:00 p.m., and around that same time another inmate (Teddy Goodman) saw defendant and Payant enter the Chaplain’s office complex and walk down an enclosed corridor to the rear room, the Chaplain’s library.
Although defendant elicited testimony from several corrections officers that they had, at various stages of the investigation, previously given statements that Payant was seen elsewhere in the institution on May 15, 1981 after 1:00 p.m., none of the witnesses testifying at trial could recall with certainty seeing her alive after 1:00 p.m.
Some time after 1:00 p.m., an inmate knocked at the outer door to the Chaplain’s office complex after hearing loud noises from inside. Defendant appeared from the rear office and, in a “nasty” manner, told the inmate to go away. That inmate later met a corrections officer in the hospital corridor, and the two of them proceeded back to the Chaplain’s office to make phone calls. When no one answered their knock, they kicked the Chaplain’s office outer door and it opened, a piece of cardboard falling out of the door. Once inside the complex, the corrections officer and another inmate who arrived shortly afterward noticed that the office was in disorder. The 55-gallon waste drum usually maintained in the outer alcove had been moved to the Chaplain’s library, was about two-thirds full, and had boards placed over its top.
Defendant returned to the Chaplain’s office with a plastic object under his arm, and went into the rear room. He told the corrections officer he had to empty some garbage, and left with the 55-gallon drum, returning some minutes later. Defendant was observed by officers in the hospital *55 corridor and the gate corridor dumpster area transporting large waste drums on a cart. The officers did not check the drums, which one officer observed to be filled to about nine inches from the top. The corrections officer and the other inmate left the Chaplain’s office about 2:45 p.m., while defendant remained inside the rear room. Shortly thereafter defendant appeared at the package room to empty the garbage, although defendant usually emptied the garbage there in the morning. This also was the first time the package room officer could remember that defendant brought the Chaplain’s office waste cart with him. The last sighting of defendant that afternoon was near the A block foyer around 3:25 p.m., when he asked a corrections captain to return a cart to the administration corridor or accompany him while he did so.
Although Payant never showed up for her assignments on May 15, her absence was not reported until approximately 6:00 p.m. Subsequent telephone calls and searches by corrections officers failed to locate her. At about 8:00 p.m., the inmates were locked in their cells.
The State Police were contacted, and that evening a State Police bloodhound unit arrived. The bloodhound was given Payant’s scent and began his trail at the westside corridor telephone where Payant received her call. On the first trail, the dog went from there up the westside corridor to D block, back down that corridor to A block, across the administration corridor, and up the eastside corridor. The dog paused and became visibly excited near an alcove in H block, then continued up the eastside corridor, out through the truck gates, back into the corridor, and up to the industry building, where he again became excited at an area on the second floor. The trail ended at the east side of the industry building. On the second and third trails, the dog took basically the same route, deviating only at one point to go into the A/B yard. After the dog completed his trails, he was led through the hospital corridor but exhibited no excitement, even though Payant unquestionably was in the hospital corridor on at least two occasions that day. The dog was not taken through the Chaplain’s office.
The institution’s dumpsters also were searched that evening. Two corrections officers climbed inside some of the *56 dumpsters and tried to examine the refuse. One officer saw some plastic bags in the gate corridor dumpster, but could not get at them. In the early morning on May 16, the institution’s garbage truck was brought in, and the dumpsters at industry, the gate corridor, the mess hall and the administration corridor were emptied into the truck and compacted, while corrections officers shone their flashlights onto the garbage. The search failed to turn up Payant’s body. Later that morning, Green Haven’s civilian garbage truck operator, accompanied by two corrections officers, took the truckload of garbage to a dump in Amenla, where the garbage was spread out and examined with the aid of a bulldozer. At that time Payant’s body was found encased in three plastic bags, her hands tied behind her back, her clothes in disarray, and a cord tied around her neck. The location of the body led the truck operator to believe that it entered the truck via the industry or the first two gate corridor dumpsters.
Plastic bags and cord were present in the package room, and the cords in the Venetian blinds of the Chaplain’s office had recently been replaced by defendant and others. The plastic bags had been taped together by masking tape. Masking tape was kept in the Chaplain’s office.
Payant’s identification card and badge case were found in a utility closet near H block on May 18. An examination of those items yielded insufficient fingerprints for any identification. Hairs were found near the door to the rear room — the library — of the Catholic Chaplain’s complex, and also in the closet of that room. Examination showed those hairs to be microscopically similar to samples of Payant’s hair, but it was not possible to make a positive identification. In addition, hairs were found in the belt buckle area and in the bra on Payant’s body. Those hairs were found to be microscopically similar to defendant’s hair, although again a positive identification could not be made. Several stains in the Chaplain’s office tested for blood were negative. Some scrapings from the office did reveal blood, but there was not sufficient quantity to determine its source or age. Dusting of the office and the 55-gallon drum for fingerprints produced nothing. The plastic bags, cord and tape found with the body of Donna *57 Payant were also examined. While one plastic bag was similar to bags taken from Green Haven, the others were not. Although all 11 pieces of masking tape used on the bags were determined to be from the same roll, the ends of that tape could not be matched to the end of the roll of masking tape found in the Chaplain’s office, which was of similar width. No fingerprints were found on the tape. The cord on the body did not match the cord removed from the Chaplain’s office Venetian blinds on May 27, 1981.
The first autopsy on Payant’s body was performed during the evening of May 16, revealing multiple injuries both before and after death. The premortem injuries included injuries to the face and head which could have rendered her unconscious instantly, injuries caused by the cord around her neck and hands, and certain injuries on her chest, including a curvilinear erosion on the upper right portion and amputation of both nipples. The postmortem injuries were consistent with the compacting and bulldozing of the garbage. The pathologist testified that his findings were consistent with the theory of the murder posited by the People.
A second autopsy was performed on May 19, 1981 by a pathologist who also reviewed photos taken at the first autopsy. He concluded that Payant had died of strangulation. Most of Payant’s premortem injuries were found to be internal, which would not produce much external bleeding, including trauma to the head that could have caused rapid loss of consciousness. The pathologist was of the opinion that the amputation of the nipples was caused by a human bite and that the mark on the upper right chest, which occurred shortly before death, could have been a human bite mark. For this reason, he contacted a forensic odontologist. Because of the perceived importance of the wound on Payant’s upper right chest, an expert photogrammetrist was employed to reproduce photographs of that area of her body in life-size. These and other materials subsequently were examined by several forensic odontologists retained by the People and by the defense.
The bite mark evidence was highly significant: if the curvilinear erosion on Payant’s upper right chest was defendant’s bite mark there was no innocent explanation *58 for its presence there. The People produced four forensic odontologists (Drs. Homer Campbell, Arthur Goldman, Lowell Levine and Neal Riesner) who testified that the mark was a bite mark made by defendant. The prosecution’s expert witnesses used two methods of identification. First, they compared a stone model of defendant’s teeth, as well as impressions made in aluwax from the model, with the life-sized photograph of Payant’s chest, identifying by visual observation individual characteristics of defendant’s teeth, such as shape of the arch and tooth shape, spacing and rotation, upon which their opinions were based. Second, the prosecution experts made photo-to-photo comparisons of the Payant mark and a bite mark known to have been made by defendant on human tissue four years earlier. The expert witnesses for the defense — three forensic odontologists (Drs. Haskell Askin, Lester Luntz and Irvin Sopher) — were of the opinion that the mark was not defendant’s bite mark, and indeed was not a bite mark at all. Their opinions were in large part based on a different technique involving the production of transparencies, made from a model of appellant’s teeth, which were laid over the photograph of the mark on Payant’s body. Although the defense technique was portrayed as a controlled method by which,the results could be objectively evaluated, in fact the experts acknowledged that steps in the production of the transparencies were subject to human variations and that, whichever technique was used, there was no completely objective method of identifying a bite mark. The methods used all depended in part upon expert judgments to establish relationships between teeth and marks.
Finally, the People introduced the testimony of an inmate (Robert DiBona) who was housed in the same unit as defendant. That inmate testified that on May 16, 1982, approximately one year after Payant’s death and after defendant had been charged with her murder, he and appellant were speaking when defendant, who seemed to be in a very emotional state, “blurted out * * * that he was being driven and he couldn’t help himself, that he had to do what he had to do”, and that “he shouldn’t never have made the phone call, that he deserved to die.” The inmate *59 believed that the reference to the phone call related to defendant’s case.
The theory posited by the defense both at trial and on appeal is that Payant was murdered as part of a conspiracy among unknown corrections officers, who lured her to the eastside corridor area of the institution by the telephone call, murdered her in the H block or industry area, and placed her body in the Green Haven dump truck while it was temporarily abandoned. This theory, which defendant concedes is “bizarre,” takes Payant far from her assigned area, and means that both Payant’s murder and the hiding and disposal of her body occurred in relatively open areas to which many people had access. This would have required a truly substantial conspiracy, which had no basis in the proof at trial.
The evidence linked defendant to the bite mark on Payant’s body. The remaining circumstantial evidence established that defendant had both the opportunity, and access to the materials, for killing Payant and disposing of her body. We therefore conclude that the evidence was of such weight and credibility as to convince us that the jury was justified in finding defendant guilty beyond a reasonable doubt.
II
The various errors in the proceedings charged by defendant are without merit.
THE BITE MARK EVIDENCE
Defendant’s major point in support of his request for a new trial concerns the admissibility of a photograph of a bite mark allegedly made by him in August 1977 on the nose of another victim, Marilee Wilson. In its presentation of the case the prosecution originally set out to identify the bite mark on Donna Payant’s body by comparing a stone model of defendant’s teeth to a photograph of the mark on Donna Payant’s body. However, Dr. Campbell, a prosecution expert, testified on cross-examination that, for purposes of identifying bite marks, human skin was the ideal material in which to take bite mark impressions. The prosecutor argued that in light of that testimony the People should be permitted to introduce the Wilson photo *60 graph for comparison of a bite mark by defendant in human skin with the Payant photograph. The court thereafter conducted a hearing out of the jury’s presence to determine (1) whether there existed an independent basis for concluding that defendant was responsible for the Wilson bite mark and (2) whether such a photographic comparison of bite marks was scientifically acceptable, and it held that a black and white photograph of the Wilson bite mark, redacted so as to show little more than the mark itself, could be admitted and a comparison made to the Payant photograph.
Defendant argues that the evidence should have been excluded for three reasons. First, he claims that his alleged confession to the Wilson homicide either was not made or was obtained in violation of his constitutional rights. If so, the only remaining evidence of his commission of the Wilson murder would have been the expert’s comparison of the stone cast of his teeth to the photo of the bite mark. Such evidence, defendant maintains, would suffer from the same flaw as comparison of the stone model of his teeth to Payant’s photograph, and thus could not be admitted to corroborate that comparison. Second, defendant contends that the Wilson photograph was inadmissible because a photo-to-photo comparison is not a generally accepted scientific procedure for identifying bite marks. Third, defendant urges that even if the evidence were otherwise admissible, it should have been excluded because the danger of unfair prejudice outweighed its probative value.
At the hearing conducted to determine the admissibility of the Wilson bite mark photograph, State Police Investigator William Barnes testified that on August 22,1977, he met with defendant and his attorney, Sanford Rosenblum, to administer a polygraph test regarding the Wilson homicide. Barnes said he brought defendant to the polygraph room, recited the Miranda warnings, and conducted a four and one-half hour interview during which defendant confessed to the Wilson homicide but then refused to take the polygraph test. Throughout the interview Rosenblum sat in an adjacent room where he could see but not hear the interview. Barnes denied agreeing with Rosenblum that any statement defendant made would not be used against *61 him, nor did he ever hear of any such agreement. Rosenblum’s testimony contradicted Barnes. Rosenblum said he arranged the polygraph examination but had an oral understanding with Barnes that defendant’s statement would be limited to other charges arising out of a kidnapping and sexual assault on Mary Ann Maggio. Rosenblum testified he did not hear the Miranda rights administered, but could not hear the interview clearly because of static in the speaker system, and was told at the end of the interview that a polygraph test was not given because the length of time Barnes spent with defendant would have rendered any result suspect.
Supported by a full explanation of its reasoning, the court found Barnes’ testimony credible and ruled that the People had shown by independent evidence that defendant was responsible for the murder of Marilee Wilson as well as the bite mark found on her body.
Defendant now argues that even if the confession was made, it was obtained in violation of his constitutional rights. Specifically, he claims that the interrogation violated the Sixth Amendment right to the presence of counsel, the Fifth Amendment privilege against self-incrimination which could only be waived knowingly and voluntarily, the State constitutional prohibition of uncounseled waivers of the right to counsel, and the due process right to demand compliance with the terms of the agreement concerning the polygraph test.
Defendant’s arguments assume that Rosenblum’s testimony must be credited and Barnes’ rejected. Having reviewed the testimony, we find no reason to disturb the conclusion of the trial court that Barnes was a credible witness. With the added benefit of having observed both witnesses as they testified, the trial court was justified in concluding that Rosenblum’s testimony may have been affected by personal concern about possible claims of inadequate representation, and that the arrangement as related by Barnes may well have been thought to serve defendant’s interests at the time in establishing an insanity defense (see People v Smith, 59 NY2d 156). Crediting Barnes’ testimony, it is evident that defendant was deprived of no constitutional rights. Appellant waived his *62 Miranda rights and no agreement was breached because of the questioning regarding the Marilee Wilson murder. Nor was there any violation of defendant’s right to counsel under the New York State Constitution since defense counsel agreed to the questioning outside of his immediate presence and placed no limit on the scope of the interview (cf. People v Beam, 57 NY2d 241, 253-254; People v Yut Wai Tom, 53 NY2d 44). Thus, the trial court properly found that there was independent basis for concluding that defendant was responsible for the Wilson bite mark.
Similarly, there is no merit in defendant’s second argument: that the technique of identification of the Payant bite mark by a photo-to-photo comparison with the Wilson bite mark was not shown to have requisite scientific acceptability.
The chief expert witness for the People, Dr. Levine,[2] testified that he could make a positive identification by comparing a photograph of a bite mark to a stone cast of teeth, but the best means for identifying a bite mark would be comparison with another bite mark made in skin in similar circumstances. According to Levine, photo comparison of different bite marks on the same victim is an accepted technique. Levine testified that, though there has been little occasion for comparison of bite marks on different persons, among forensic odontologists such a procedure was reliable and accepted, and he named seven such odontologists (among 45 to 50 in the Nation) who have recognized it. Levine had himself used this technique previously and on one occasion testified in court on the procedure. For the defense, the principal expert witness, Dr. Luntz, testified that the comparison of a 1977 photograph of a bite mark on a nose with a 1981 photograph of a bite mark on a chest was not generally accepted as a reliable technique for identifying the biter. He noted differences in the elasticity of skin and in skin properties depending on the affected area of the body, and observed that skin is not a good medium for registering bite marks. Dr. Luntz testified that photographs create distortions, but acknowledged that he had relied on a photo-to-photo comparison for purposes of excluding a suspect as the biter.
*63 The court overruled defendant’s objection to the evidence, reasoning that the photographic comparison was admissible here, as buttressed by identification through additional, more conventional means, such as (1) the comparison of a 1977 stone cast of defendant’s teeth with a photograph of the 1977 Wilson bite mark, (2) the comparison of the 1977 cast with a cast of defendant’s teeth taken in 1981, and (3) the comparison of the Payant photograph with the 1981 stone cast of defendant’s teeth.
In People v Middleton (54 NY2d 42), this court recognized that identification of the perpetrator of a crime through bite mark evidence had gained general acceptance in the scientific community. “[T]he test is not whether a particular procedure is unanimously indorsed by the scientific community, but whether it is generally acceptable as reliable.” (Id., at p 49.) The techniques employed in Middleton (photography, freezing of tissue specimens, taking of dental molds, visual observation) were approved by the majority of experts in the field as well as by appellate courts and therefore were accepted as generally reliable without a hearing concerning the scientific principles involved.
The need for comparison of bite marks on different victims apparently arises infrequently, and there are no published standards governing the process. Middleton specifically mentioned the use of photographs as a generally reliable technique in bite mark identification. Moreover, this was not a situation, like Middleton, where techniques were accepted without a hearing. Extensive examination and cross-examination of the experts centered on methodology. The prosecution experts testified that the technique was reliable and accepted by the scientific community. The defense experts acknowledged the reliability and acceptance of photographic comparisons for exclusion purposes, and there was testimony establishing the reliability of such comparisons for inclusion purposes when bites appear on different parts of the body of a single victim. Given the acceptability of photographs for comparisons of bites on a single victim and the other evidence, we conclude that the process here was not significantly different. Indeed, because of a similarity in both the substance *64 on which the bite marks were imprinted and the circumstances surrounding infliction of the marks, a photographic comparison could have a reliability not present with other techniques. We therefore agree that no error was committed in permitting the photo-to-photo comparison.
Finally, the probative value of the Wilson photograph outweighed its potential for unfair prejudice and was therefore properly admitted.
Evidence of uncharged crimes, though inadmissible to establish criminal propensity, is admissible if offered for some other relevant purpose (People v Allweiss, 48 NY2d 40, 46). One recognized ground for admission is to prove the defendant’s identity, so long as identity is not otherwise conclusively established (People v Beam, 57 NY2d 241, supra; People v Condon, 26 NY2d 139). “In final analysis the process is one of balancing in which both the degree of probativeness and the potential for prejudice of the proffered evidence must be weighed against each other” (People v Ventimiglia, 52 NY2d 350, 359-360).
The redaction of the Wilson photograph was so complete that little more than a jagged line representing the teeth marks appears, and the parties were required, in the presence of the jury, to refer to the exhibit only as defendant’s known bite mark in human tissue. Based on our own examination of the photograph, we find it highly unlikely that the jury could have drawn any conclusions about defendant’s past acts of violence. Similarly, while a juror might perhaps have speculated as to the origin of the bite mark, the redacted photograph as well as the innocuous description were fully consistent with noncriminality and certainly conveyed none of the circumstances surrounding Marilee Wilson’s brutal murder. Thus, the danger of unfair prejudice, if not eliminated, was minimal.
In characterizing the probative value of the evidence as negligible, defendant claims that the identification of the bite mark on Donna Payant’s body through a photographic comparison was cumulative (see People v Ventimiglia, 52 NY2d 350, 360, supra; People v Blanchard, 83 AD2d 905, 906). Prosecution experts did identify the mark on Pay-ant’s body by comparing it with models of defendant’s *65 teeth. But defense experts vigorously disputed this identification; moreover, testimony was elicited by the defense to the effect that human skin was an ideal medium for bite mark identification. In these circumstances, identifying the bite mark through another procedure cannot be dismissed as cumulative.
Defendant also argues that the comparison of the photographs was unnecessary because the prosecutor could have applied for a court order compelling defendant to bite into his own skin. Without determining that a court could have required defendant to bite himself with the force necessary to leave a mark like that present on Payant’s body, no error was committed in not following that course. The mark left by defendant, who would have known both how this evidence was to be used and the precise method of infliction of the mark on Payant, could properly be regarded as not representative.
In light of the limitations placed on the prosecution’s use of the Wilson photograph and the probative value in comparing the unknown Payant mark to one known to have been made by defendant in human tissue, no error was committed by the admission of that evidence.
THE DIBONA TESTIMONY
Defendant contends that reversal is appropriate because of a document discovered after trial which allegedly cast doubt on the testimony of the prosecution witness DiBona. DiBona testified that on May 16,1982, during a recreation period, defendant made statements implicating himself in the murder of Donna Payant.
At some point in the prosecution, the defense submitted the following request for disclosure: “it would be appreciated if you would send to my attention Lemuel Smith’s institutional record and the daily log book while Mr. Smith was housed in Cell Number 11.” In response to this request the Special Prosecutor turned over excerpts from the SHU (Special Housing Unit) logbook, a detailed record of events such as meal periods, prisoner visits and inmate counts. The excerpts also reveal that several recreation periods were conducted throughout the day on May 16. Two of these periods are reflected in the following entries:
*66 “8:50 PC[3] back from rec.
“8:55 PC to rec (6 inmates)
“9:50 PC back from rec.”
After trial, defendant himself obtained a “Chronological Report on Inmates Assigned to Special Housing Unit — Downstate Correctional Facility.” This report covers defendant’s activities over a 24-day period and contains one or more entries for each day. It records such events as church visits, court appointments, showers and the administration of medication. Though the report does not disclose when defendant went to recreation, it does indicate that he refused recreation 10 times on 9 different days during the 24-day period. The three entries for May 16 are:
“9:30 AM Seen Father Licata
“9:35 AM Med. from R. N.
“2:20 PM Call out to visit #2 Sgt. R.”
There is no indication that defendant refused recreation on May 16.
Defendant moved, pursuant to CPL 330.30, to set aside the verdict because of this “newly discovered evidence.”[4] The report, according to defendant, demonstrated that he did not visit the recreation yard on May 16 and thus could not have made the statements to DiBona. In reply, the People claimed that there was no indication of a request for this document and, in any event, the report failed to demonstrate that DiBona and defendant were not in the recreation yard at the same time. The court denied the motion, finding the evidence “ambiguous, and of only speculative value.” On appeal, defendant contends that the prosecutor breached his duty to disclose exculpatory material.
The suppression of exculpatory evidence in the face of a specific and relevant defense request will seldom, if ever, *67 be excusable (United States v Agurs, 427 US 97; Brady v Maryland, 373 US 83; People v Cwikla, 46 NY2d 434). However, where the defense makes only a general request, or none at all, the failure to turn over obviously exculpatory material violates due process only if the omitted evidence creates a reasonable doubt which did not otherwise exist. (United States v Agurs, 427 US 97,112, supra.)
It would be inappropriate to apply the standard which obtains where the prosecutor had notice of exactly what the defense desired and suppressed it. Since the request did not put the prosecutor on notice that this specific document existed, he could have reasonably concluded that the disclosure of the SHU logbook satisfied the request. The record is devoid of any indication of prosecutorial bad faith or negligence. Thus, applying the Agurs standard, a new trial would be required only if the material were obviously exculpatory and created a reasonable doubt not otherwise existing.
The report satisfies neither requirement. Initially, it fails to establish that defendant did not participate in the recreation period between 8:55 a.m. and 9:50 a.m. because he could have been called out of recreation to meet with the priest. The discussion between DiBona and defendant could have occurred during one of the other recreation periods that day. Indeed, to the extent the report sheds any light on the question whether defendant went to the recreation yard on May 16, the report implies that he did, since — unlike the days when defendant refused recreation — there was no record of defendant’s refusal to attend recreation on May 16. Accordingly, the trial court properly denied this branch of defendant’s motion to vacate.
ADDITIONAL ISSUES SUPPORTING REQUEST FOR NEW TRIAL
The Unusual Incident Report: Corrections Officer Eric Johnson, a defense witness, testified that he was assigned to the F and G corridor during his 9:45 a.m. to 5:45 p.m. shift on May 15, 1981. Three days after the murder, on May 18, 1981, Johnson told police that on the day of the crime he observed Payant walking toward him shortly after 2:00 p.m. However, on September 18,1981, he signed a statement indicating that this observation was *68 made on the same day he assisted an inmate in setting a digital watch, an event which occurred on May 8, 1981, a week before the murder. In the midst of the prosecutor’s summation, the defense obtained from a third party a copy of an “unusual incident” report, containing the following notation, “2:08 [a.m., May 16, 1981] per conversation with Officer Johnson — he reported seeing Officer Pay ant in F and G corridor at approximately 1:30 p.m.” Counsel moved for a mistrial, arguing that the jury would have been much less likely to accept Johnson’s story about the mix-up in dates had it been aware that a mere 12 hours after the observation Johnson said he saw Payant on the 15th. Any error in the prosecutor’s nondisclosure of this report was cured when the trial court interrupted the People’s summation, allowed defense counsel to recall Johnson and place this evidence before the jury, and permitted him to address the jury on this issue before the prosecutor resumed his summation.
Recusal of the Trial Judge: Defendant next argues that the Trial Judge should have recused himself for three reasons: he appointed the prosecutor whose conduct with respect to the submission of evidence to the Grand Jury was being questioned; he had exhibited hostility toward defense counsel in denying several pretrial motions; and he had been associated with the Special District Attorney, when, as District Attorney of Dutchess County, he had hired the Special District Attorney as an Assistant District Attorney. These claims are unpersuasive. A Trial Judge’s impartiality is not undermined merely by appointment of counsel for one of the adversaries. Nor did the court exhibit bias in ruling on defense motions. To the contrary, the record demonstrates that the court dealt with defense requests in an evenhanded manner. Finally, the decision on a recusal motion is generally a matter of personal conscience. While it may have been the better practice for the court to insure that defense counsel was aware of its previous relationship with the Special District Attorney, the association was not so substantial that the court abused its discretion in presiding over the trial. (Compare Matter of Corradino v Corradino, 48 NY2d 894; see, also, People ex rel. Stickle v Fay, 14 NY2d 683.)
*69 Delay in Appointing Counsel and Disparity in Funding: Defendant challenges as violating his right to counsel the delay in appointing his present counsel and the disparity in funding between the prosecution and the defense. Defendant’s counsel first appeared for defendant on June 10, 1981, when appellant informed him that he lacked confidence in the Public Defender’s office. Counsel declared in open court that he would serve without compensation. Some months later, however, he made the first of a series of legal moves to obtain compensation for his services. These requests were denied. In March 1982, defendant discharged counsel because of the funding impasse and the court appointed the Dutchess County Public Defender, who was unable to establish a meaningful attorney-client relationship with defendant. Finally, in September 1982, the court granted the Public Defender’s motion to be relieved and defendant’s counsel and his associate were appointed, with compensation at the established rates for defense counsel. Whatever other rights defense counsel may have to receive increased compensation, in order to prevail on this appeal defendant must show that his defense was ineffective as a result of the delay or disparate funding. Such a showing has not been made. Nor can the court presume that the alleged errors resulted in' a denial of meaningful representation where our independent review of the record belies this conclusion.
Change of Venue: Prior to jury selection, defendant moved in the Appellate Division for a change of venue because of the great number of penal facilities in Dutchess County, the substantial impact of their presence on the economy of the community, the atmosphere of hatred and fear, and the danger of racism. We find no error in the court’s conclusion that the application should have awaited the results of voir dire (see People v Culhane, 33 NY2d 90; People v Boudin, 87 AD2d 133,135). Since defendant failed to renew the motion following voir dire, there is no other ruling for this court to review (People v Parker, 60 NY2d 714).
Hypnosis Charge: Although several prosecution witnesses were hypnotized, the trial court determined that it would limit their testimony to events recalled prior to *70 hypnosis, and defendant admits that the hypnosis issue was not a major factor before the jury. In People v Hughes (59 NY2d 523, 548), the court said that a trial court should instruct the jury that a hypnotized witness usually acquires a measure of confidence in events recalled under hypnosis — if the defendant requests such a charge. Defendant failed to ask for this instruction, and its absence from the charge does not warrant reversal in the interest of justice.
Further Cross-Examination of Goodman: The trial court did not abuse its discretion in prohibiting defense counsel from cross-examining Teddy Goodman more extensively about the details of his testimony at his own murder trial. (Goodman testified that on May 15, 1981, he saw defendant and Payant enter the Chaplain’s office together.) Counsel had already mounted a substantial attack on Goodman’s credibility and the limits placed on cross-examination regarding a collateral crime were not unreasonable (see Cohen and Karger, Powers of the New York Court of Appeals [rev ed], § 197, p 740).
Ill
Having found that the evidence was convincing beyond a reasonable doubt, and having discovered no error warranting a new trial, we turn to defendant’s challenge to the constitutionality of New York’s death penalty statute.
Defendant was convicted of murder in the first degree under section 125.27 of the Penal Law, which provides: “A person is guilty of murder in the first degree when: 1. With intent to cause the death of another person, he causes the death of such person; and * * * at the time of the commission of the crime, the defendant was confined in a state correctional institution, or was otherwise in custody upon a sentence for the term of his natural life, or upon a sentence commuted to one of natural life, or upon a sentence for an indeterminate term the minimum of which was at least fifteen years and the maximum of which was natural life, or at the time of the commission of the crime, the defendant had escaped from such confinement or custody and had not yet been returned to such confinement or custody; and * * * [the] defendant was more than eighteen years old at the *71 time of the commission of the crime.” Upon a conviction of first degree murder, the court must impose a sentence of death (Penal Law, § 60.06).
Defendant argues primarily that the statute’s failure to allow the sentencer to consider any relevant mitigating circumstances violates the Eighth and Fourteenth Amendments’ prohibition of the infliction of cruel and unusual punishments.[5] To prevail on this claim, defendant must overcome the strong presumption of constitutionality which attaches to legislative enactments (People v Davis, 43 NY2d 17, 30, supra).
Mindful of the singular gravity of the death penalty, our legal system has struggled to accommodate the twin objectives of “a system of capital punishment at once consistent and principled but also humane and sensible to the uniqueness of the individual.” (Eddings v Oklahoma, 455 US 104, 110.) While not addressing the precise issue before us, over the past 12 years since Furman v Georgia (408 US 238), the Supreme Court in a line of decisions reviewing death penalty statutes, has defined the criteria required to meet these objectives.
In Furman, the court nullified a statute which gave the sentencer unguided discretion to decide whether to impose the death penalty. Although the five-Justice majority did not agree on a uniform rationale, the case is generally interpreted to prohibit the arbitrary and capricious imposition of the death penalty (see Gregg v Georgia, 428 US 153, 188, 195, 206). The court provided further explanation of the constitutional requirements for death penalty statutes in a group of cases decided in 1976. Finding, substantively, that capital punishment was not a per se violation of the Eighth Amendment, the court examined the procedures used in imposing such a sentence. A three-Justice plurality *72 concluded that the concerns of Furman could be satisfied “by a carefully drafted statute that ensures that the sentencing authority is given adequate information and guidance” (Gregg v Georgia, 428 US 153, 195, supra), and the court upheld the “guided discretion” statutes of three States (Id.; Proffitt v Florida, 428 US 242; Jurek v Texas, 428 US 262).
However, the court struck down two death penalty statutes which provided for a mandatory death sentence upon conviction for specified crimes (Woodson v North Carolina, 428 US 280; Roberts [Stanislaus] v Louisiana, 428 US 325). The Woodson plurality identified three independent deficiencies in a mandatory death penalty statute. First, in light of the near-universal rejection of mandatory death penalties prior to Furman, such a statute violated the “evolving standards of decency which mark the progress of a maturing society.” (Trop v Dulles, 356 US 86, 101.) The reenactment of the death penalty by some States after Furman reflected attempts “to retain the death penalty in a form consistent with the Constitution, rather than a renewed societal acceptance of mandatory death sentencing” (Woodson v North Carolina, 428 US 280, 298, supra). Second, the mandatory death penalty failed to answer Furman’s concern about unbridled sentencing discretion because jurors often vote to acquit despite sufficient evidence of guilt where the inevitable consequence of their guilty verdict is a death sentence. Third, a mandatory death sentence failed to allow for particularized consideration of relevant aspects of the defendant’s character and record and the circumstances of the offense: “While the prevailing practice of individualizing sentencing determinations generally reflects simply enlightened policy rather than a constitutional imperative, we believe that in capital cases the fundamental respect for humanity underlying the Eighth Amendment, see Trop v. Dulles, 356 U. S., at 100 (plurality opinion), requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death.” (Id., at p 304.) Because death, “in its finality, differs more from life imprisonment than a 100-year prison. *73 term differs from one of only a year or two * * * there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case” {id., at p 305). This sharpened need in the case of each irreversible execution precludes treating all persons subject to such penalty as “a faceless, undifferentiated mass” {id., at p 304).
Even where the death penalty statute was narrowly restricted to five defined categories of homicide, in Roberts (Stanislaus) (428 US 325, supra) the absence of meaningful opportunity for the sentencer to consider mitigating factors was considered a fatal infirmity: “The diversity of circumstances presented in cases falling within the single category of killings during the commission of a specified felony, as well as the variety of possible offenders involved in such crimes, underscores the rigidity of Louisiana’s enactment and its similarity to the North Carolina statute. Even the other more narrowly drawn categories of first-degree murder in the Louisiana law afford no meaningful opportunity for consideration of mitigating factors presented by the circumstances of the particular crime or by the attributes of the individual offender.” (Id., at pp 333-334.)
Subsequent decisions both in the Supreme Court and this court have invalidated mandatory death penalty statutes which do not permit consideration of mitigating circumstances, however heinous the crime. In Roberts (Harry) v Louisiana (431 US 633), the Supreme Court declared unconstitutional a statute which mandated a sentence of death upon a conviction for intentional murder of a police officer, stating that it was incorrect to assume that no mitigating circumstances could exist when the victim is a police officer. Among the circumstances which could be offered in mitigation were the offender’s age and prior record, the influence of drugs, alcohol or extreme emotional disturbance, and “even the existence of circumstances which the offender reasonably believed provided a moral justification for his conduct” (id., at p 637). “[I]t is essential that the capital-sentencing decision allow for consideration of whatever mitigating circumstances may be relevant to either the particular offender or the particular offense.” (Id.) Following Roberts (Harry), this court in *74 People v Davis (43 NY2d 17, supra) invalidated that portion of New York’s mandatory death penalty which applied to the intentional murder of a corrections officer: “plainly and simply and without verbiage, because the New York statute ‘does not allow consideration of particularized mitigating factors’ for purposes of ‘the capital sentencing decision’ as to ‘the particular offender’, it is unconstitutional.” (Id,., at p 33.)
In Lockett v Ohio (438 US 586), the Supreme Court reviewed an Ohio statute which limited the number of mitigating circumstances which could be considered. As the plurality wrote: “There is no perfect procedure for deciding in which cases governmental authority should be used to impose death. But a statute that prevents the sentencer in all capital cases from giving independent mitigating weight to aspects of the defendant’s character and record and to circumstances of the offense proffered in mitigation creates the risk that the death penalty will be imposed in spite of factors which may call for a less severe penalty. When the choice is between life and death, that risk is unacceptable and incompatible with the commands of the Eighth and Fourteenth Amendments.” (Id., at p 605.) A majority of the Supreme Court embraced this rule in Eddings v Oklahoma (455 US 104, supra). Because the sentence of death was imposed without consideration of mitigating factors required by the Eighth and Fourteenth Amendments in capital cases, Eddings’ conviction for murder of a police officer was set aside, and the case remanded for consideration of all relevant mitigating circumstances. “By holding that the sentencer in capital cases must be permitted to consider any relevant mitigating factor, the rule in Lockett recognizes that a consistency produced by ignoring individual differences is a false consistency.” (455 US 104, 112, supra.)
Individualized consideration of the offender and the offense is simply a recognition that in every case there are invariably differences. In capital cases, where such consideration is constitutionally required, the purpose is to reduce the risk that the death penalty will be imposed in spite of factors about the person or the crime which call for a different penalty. The requirement is premised not on the *75 fact that one class of crimes is more or less atrocious than another, or one category of defendants more or less sympathetic, but on the final, irrevocable quality of the death penalty. This same concern necessarily pervades every capital case. Thus, under the standards established by the Supreme Court, any death penalty statute which did not provide for consideration by the sentencer of all relevant individual circumstances would be incompatible with the commands of the Eighth and Fourteenth Amendments.
But the issue on this appeal cannot be so readily resolved. The Supreme Court has repeatedly, without explication, stated that it was not deciding whether the Eighth Amendment forbids a mandatory death penalty for murder committed by a person serving a life term of imprisonment (Lockett v Ohio, 438 US 586, 604, n 11, supra; Roberts [Harry] v Louisiana, 431 US 633, 637, n 5, supra; Roberts [Stanislaus] v Louisiana, 428 US 325, 334, n 9, supra; Woodson v North Carolina, 428 US 280, 287, n 7,292, n 25, supra; Gregg v Georgia, 428 US 153, 186, supra).[6] This court also has expressly left the question open (People v Davis, 43 NY2d, at p 34, n 3).
In Lockett, the plurality hinted at a reason why such a departure from constitutional requirements could even be considered: “We express no opinion as to whether the need to deter certain kinds of homicide would justify a mandatory death sentence as, for example, when a prisoner — or escapee — under a life sentence is found guilty of murder” (438 US 586, 604, n 11, supra; see, also, People v Davis, 43 NY2d 17, 43 [Breitel, Ch. J., dissenting], supra).
If the Supreme Court indeed intended to limit its reservation to the conceivable need for deterring murder by a life-term inmate with no possibility of parole, who could not otherwise be punished, then the reservation is not even applicable to defendant. Although the sentences for defendant’s prior crimes were consecutive, they were imposed under section 70.30 of the Penal Law as it existed before the 1978 amendment. Thus, when he committed the present offense defendant was serving an indeterminate prison term with a minimum of 25 years and a maximum *76 of life, and (according to defense counsel, undisputed by the People) had the prospect of parole in 2003, at the age of 63.
That, even in the case of life-term inmates, there may be penalties available to punish and thus deter further crime underscores the necessity, in fulfilling the twin objectives of our capital-sentencing system, for requiring individual consideration of the offense and the offender.[7] In New York, a life sentence is not the necessary equivalent of life imprisonment. Diverse crimes are classified as A-l felonies and thus punishable by a minimum sentence of 15 years and a maximum term of life (Penal Law, § 70.00), including arson (Penal Law, § 150.20), kidnapping (Penal Law, § 135.25), drug offenses (Penal Law, §§ 220.21,220.43), and persistent felony offenses (Penal Law, § 70.10; see, also, Penal Law, § 70.08). Life-term inmates thus include persons who have never before committed a violent act, and persons with a realistic prospect of parole. Even before reaching the invariable differences in the circumstances of the crime, it is obvious that life-term prisoners in this State are not “a faceless, undifferentiated mass.” (Woodson v North Carolina, 428 US 280, 304, supra.) Given the Supreme Court’s definition of the rationale underlying the requirement of individual consideration by the capitalsentencer, society has no less motivation to avoid irrevocable error in fixing the appropriate penalty for life-term inmates than other human beings.
Where the question is whether the death penalty is per se unconstitutional, one can argue capital punishment is necessary to deter a person under a sentence of life imprisonment from committing additional crimes because any other sentence would be merely cumulative. This concern evidently led the Gregg court, in its discussion of whether the death penalty was per se unconstitutional, to note that other sanctions may be inadequate to deter lifers. Indeed, the Supreme Court’s reservation regarding life prisoners had its genesis in this discussion in Gregg v Georgia (428 *77 US 153,186, supra), and logically pertains to evaluation of the death penalty per se. But the distinction is not similarly meaningful where a statute is attacked only because the imposition of the death penalty is mandatory.
Execution is never an inevitable consequence of a criminal act. In every case, including one where the death sentence is mandatory upon conviction, it is only the specter of execution which can serve as a general deterrent. In the process of investigation and adjudication, there are several points where the ultimate imposition of the death penalty may be precluded. Initially, a culprit rarely expects to get caught. Even if the defendant is apprehended, the Grand Jury may not indict for a capital offense, the District Attorney may consent to a guilty plea to a noncapital offense (CPL 220.10), or the petit jury may return a verdict of not guilty. After conviction, an appellate court may reverse as to sentence or the executive may commute the sentence. Thus, even where the death penalty is mandatory, its imposition, in the eyes of an individual about to commit a crime, can never be more than a possibility.
Because execution is not inevitable, a discretionary death penalty, which allows for the consideration of the character as well as the record of the individual offender and the circumstances of the particular offense, differs little in terms of deterrence from a mandatory death penalty and does not in fact detract from the value of capital punishment as a deterrent. This conclusion is especially warranted upon the recognition that any defendant’s status as a life-term inmate would constitute a powerful aggravating circumstance and undoubtedly increase the likelihood that the sentencer would find the death penalty appropriate under all the circumstances.
While the People suggest that retribution and the protection of prison guards and the prison population support a departure from constitutional command in the case of life-term inmates, these fail as bases for a principled distinction for the same reasons as relate to deterrence. Providing the sentencer with the option of imposing the death penalty is no less an expression of society’s outrage, of its vital concern for the safety of prison guards and the prison *78 population, and its resolve to punish maximally, than a mandatory death sentence. The sentencer merely is given the authority to impose a different penalty where, in a particular case, that would fulfill all of society’s objectives. A mandatory death statute simply cannot be reconciled with the scrupulous care the legal system demands to insure that the death penalty fits the individual and the crime.
The People argue that New York’s death penalty statute is so narrowly drawn as to include by definition a consideration of aggravating and mitigating circumstances — that the defendant’s age, prior record of serious crimes and homicidal intent are all elements of first degree murder, and that the affirmative defense of extreme emotional disturbance is a built-in mitigating circumstance. Even if it were true, that the statute comprehended every mitigating circumstance a defendant might be able to show,[8] this precise argument, urged also by the dissent, has already been rejected by this court. In People v Davis (43 NY2d 17, 34, supra), we identified “the fundamental error” in built-in defenses: “defenses relate to guilt or innocence whereas a mitigating factor may be of no significance to a determination of criminal culpability * * * The point is that what is urged in mitigation will often not rise to the level of a defense.” (See, also, Roberts [Stanislaus] v Louisiana, 428 US 325, 332, supra.)
In sum, New York’s mandatory death penalty is constitutionally infirm as applied to this defendant because of its failure to provide for the consideration of individual circumstances, one of the three deficiencies of a mandatory death penalty articulated in the plurality opinion in Woodson.[9] In view of our conclusion that New York’s *79 statute contravenes the Federal Constitution, we do not reach the issue of the State Constitution’s similar prohibition of cruel and unusual punishments (art I, § 5), or defendant’s additional arguments that a mandatory death penalty for life-term inmates suffers from the other two deficiencies of a mandatory death statute identified in Woodson.
The Attorney-General, relying primarily on People v Bailey (21 NY2d 588), argues in the alternative that the court should deem the death penalty statute to include a provision for consideration of mitigating circumstances and remit for a hearing. In Bailey, this court considered the validity of a statute which permitted the sentencing Judge to impose an alternative indeterminate term of imprisonment upon sex offenders. Since additional findings were necessary before this alternative sentence could be imposed, a then-recent Supreme Court case (Specht v Patterson, 386 US 605) required a hearing. The court construed New York’s statute in a manner as to uphold its constitutionality and read into the statute a requirement for a hearing. This reading was not inconsistent with the language of the statute. By contrast, section 60.06 of the Penal Law provides that “the court shall sentence the defendant to death” upon a first degree murder conviction. The Attorney-General’s suggested interpretation is wholly at odds with the wording of the statute and would require us to rewrite the statute. This we cannot do. (See State v Cline, 121 RI 299; United States v Harper, 729 F2d 1216).
Based on our review of the record, the People have established defendant’s guilt of murder in the first degree (Penal Law, § 125.27, subd 1, par [a], cl [iii]). We therefore modify the judgment by vacating the sentence of death and remitting this case to the Supreme Court, County of Dutchess for resentencing in accordance with section 70.00 of the Penal Law (see Penal Law, § 60.05, subd 2) and, as so modified, the judgment should be affirmed.
*80 GREEN HAVEN CORRECTIONAL FACILITY N vlf OUTBt WALL —o— iwa i nan SATE £2 —o— TVa 12

. Defendant was actually given three consecutive sentences of 25 years to life, but they were imposed under section 70.30 of the Penal Law as it existed before the 1978 amendment (L 1978, ch 481, § 24), and therefore merged into a single 25-year-to-life term.

. The testimony of the remaining experts, both for the prosecution and for the defense, was substantially similar to that of Drs, Levine and Luntz, respectively.

. “PC,” denoting “Protective Custody,” refers to the inmates.

. [5] In a noncapital case, “[t]he power to review a discretionary order denying a motion to vacate judgment upon the ground of newly discovered evidence ceases at the Appellate Division.” (People v Crimmins, 38 NY2d 407,409.) Even in a capital case, this court has been most reluctant to substitute its discretion “to overturn the lower courts’ exercise of discretion in denying a motion for a new trial upon the ground of newly discovered evidence.” (Id., at p 416.)

. The People urge that defendant has no standing to attack the statute on this basis because he has not actually shown any mitigating circumstances, and the statute must be evaluated as applied to him. Where the statute is attacked because it affords no opportunity to show mitigating circumstances, a defendant can hardly be denied review for failure to show any. It would be nothing short of outrageous to put a defendant to death because his counsel failed to make an offer of proof of mitigating circumstances, when the statute did not permit the sentencer to consider any mitigating circumstances. Moreover, death penalty statutes have been reviewed without a specific showing by defendant that the constitutional defects actually prejudiced him. (See, e.g., Roberts [Stanislaus] v Louisiana, 428 US 325; Woodson v North Carolina, 428 US 280; and People v Davis, 43 NY2d 17.)

. In the Supreme Court’s most recent decision on the subject, Eddings v Oklahoma (455 US 104), the majority did not perpetuate the reservation as to life-time inmates.

. While the dissent notes that evaluating deterrence and alternate punishments is for the Legislature, not the courts, such considerations are hardly to be ignored by us in light of the Supreme Court’s reference to deterrence as a basis for its persistent “lifer” reservation (see Lockett v Ohio, 438 US 586, 604, n 11). In order to determine the proper application of that reservation, it is obviously necessary to consider the basis on which it rests.

. For example, mental defect short of insanity (see, e.g., Lockett v Ohio, 438 US 586, 612-613), which is not specified in New York’s statute, might be a mitigating circumstance. While the dissent takes comfort from the Supreme Court’s approval in Proffitt v Florida (428 US 242) of a death penalty statute which contained a limited list of mitigating factors, the court later made clear that, in approving the Florida statute, “six Members of this Court assumed * * * that the range of mitigating factors listed in the statute was not exclusive” (Lockett v Ohio, 438 US 586, 606, supra). Similarly, the Court’s approval of the Texas statute in Jurek v Texas (428 US 262) rested on the conclusion of three Justices that the statute was broadly interpreted so as to permit the sentencer to consider whatever mitigating circumstances the defendant might be able to show. (Lockett v Ohio, 438 US 586, 607, supra.)

. Our conclusion is consistent with the results reached by other courts. (See Shuman v Wolff, 571 F Supp 213, 217, app pending [“(i)mposing mandatory capital *79 punishment for the life term prisoner who intentionally kills is to consider but one aspect of the character and record of the individual while ignoring totally the circumstances of the crime for which he is being sentenced”]; State v Cline, 121 RI 299, 303 [“a death sentence imposed by a sentencer who is not statutorily authorized to consider mitigating circumstances is a nullity”]; Graham v Superior Ct, 98 Cal App 3d 880, 888 [a mandatory death penalty “is not sufficiently narrow to encompass a consideration of mitigating factors required for a finding of constitutionality”].)