RAYMOND WALLACE SHUMAN, Appellant, *v.* THE
STATE OF NEVADA, Respondent.

No. 8341

May 17, 1978                                                    578 P.2d 1183

[Rehearing denied June 19, 1978]

*Rodlin Goff,* State Public Defender, and *Michael R. Griffin* and *J. Thomas Susich;* Deputy Public Defenders, Carson City; and *Raymond Wallace Shuman, in pro. per.,* for Appellant.

*Robert List,* Attorney General, and *D. G. Menchetti,* Deputy Attorney General, Carson City; *Michael E. Fondi,* District Attorney, Carson City, for Respondent.

## OPINION

By the Court, MOWBRAY, J.:

A jury found appellant, Raymond Wallace Shuman, guilty of capital murder. Shuman, who was serving a life sentence without possibility of parole, was charged with the fatal killing of a fellow prisoner. Under the provisions of a mandatory death sentence then in effect, Shuman was sentenced to death. NRS 200.030 (1973) (amended 1975, 1977).[1] He has appealed,

[1]NRS 200.030 then read, in pertinent part: "1. Capital murder is murder which is perpetrated by: . . . (b) A person who is under sentence of life imprisonment without possibility of parole. . . . 5. Every person convicted of capital murder shall be punished by death." 1973 Nev. Stats., ch. 798, § 5, at 1803-04.

asserting numerous assignments of error, which we reject as meritless; therefore, we affirm.

## I.

## THE FACTS

On August 27, 1973, Ruben Bejarno, an inmate at the Nevada State Prison, was set afire and burned with a flammable fluid. He was given emergency treatment at Carson-Tahoe Hospital in Carson City and transferred to Valley Medical Center in Santa Clara, California. He died three days later.

When he was transferred from the prison to the hospital, he said several times in the presence of an officer, "[a]ll over a window." Bejarno stated at the hospital that it was Shuman who had set him afire. He reiterated this statement, upon questioning, at the medical center.

Shuman and Bejarno occupied adjoining cells. Two cans containing flammable fluid, both with Shuman's fingerprints, were found in Bejarno's cell. When Bejarno ran from his cell in flames, Shuman was seen near Bejarno's cell making throwing motions. The State's contention was that Shuman threw the empty cans into Bejarno's cell after he had set him afire. Shuman's hair was singed; he suffered a severe burn on his left hand. It was also learned that the two had been fighting, just prior to the incident, over opening a window located near their cells.

## II.

## ISSUES RAISED BY COUNSEL

Shuman, through his counsel, urges reversal on the grounds (1) that the trial court erred in admitting the dying declarations of the deceased and (2) that imposition of the death penalty constitutes cruel and unusual punishment in violation of the eighth and fourteenth amendments to the United States Contitution and article 1, section 6, of the Nevada Constitution.

A.    *The Dying Declarations.*

1.    Bejarno suffered third-degree burns over ninety percent

The current version of the statute, enacted by an Act of May 17, 1977 (1977 Nev. Stats., ch. 585, at 1541 et seq.), provides for a separate penalty hearing by the jury or, in some circumstances, a panel of three district judges. NRS 175.552–175.562, 177.055. The death penalty may be imposed in case of conviction of first-degree murder "only if one or more aggravating circumstances are found and any mitigating circumstances which are found do not outweigh the aggravating circumstance or circumstances." NRS 200.030, subsection 4(a). Murder "committed by a person under sentence of imprisonment" is listed as one of the circumstances by which murder of the first degree may be aggravated. NRS 200.033, subsection 1.

of his body, second-degree burns over nine percent of his body, and first-degree burns over one percent of his body. The record establishes that a person sustaining burns of this magnitude has no chance of survival.

A correctional officer at the prison who accompanied Bejarno to the hospital emergency room testified that Bejarno was burned very badly, was charred in many places, had blood oozing from his legs and ankles, and had great difficulty in breathing. Predicated on these observations, the trial court permitted, over objection, the officer to testify that Bejarno stated repeatedly, "[a]ll over a window."

In State v. Teeter, 65 Nev. 584, 200 P.2d 657 (1948), this court ruled that a lay person is competent to testify when an injured person is conscious of impending death, providing the witness observed the injured person, his symptoms and expressions, and the declarant's general physical condition. *Teeter* supports the trial court's ruling in admitting Bejarno's statement, "[a]ll over a window," made repeatedly while en route to the hospital emergency room.

Shuman suggests, however, that, even so, the statements should not have been received, because they did not include any relevant facts surrounding the actual burning; that they were only the opinion of the declarant relating to the reason for the assault. Prior to the adoption of NRS 51.335[2] in 1971, Nevada did not admit as dying declarations, expressions of opinion. The authorities were split regarding what amounted to a statement of fact relating to an injurious act and what was only an opinion. Wigmore, however, had long noted that the fact/opinion distinction was unsound and should be abolished. *See* cases collected at 5 J. Wigmore, Evidence § 1434, at 282–83 (1974). The federal rule does away with this distinction and permits dying declarations to include both the cause and the circumstances surrounding the declarant's death. *See* 11 Moore's Federal Practice § 804.01[11], at VIII–228 to –229 (1976). NRS 51.335, taken from example 3 of proposed federal rule 804, is broader than the rule as finally enacted by Congress. We therefore conclude that our statute, NRS 51.335, dispenses with the fact/opinion distinction and that the decedent's statements were properly received.

2. Bejarno, at Carson-Tahoe Hospital, identified Shuman as his assailant. Shuman claims the testimony of the identification was inadmissible because Bejarno was not told at that

---

[2]NRS 51.335: "A statement made by a declarant while believing that his death was imminent is not inadmissible under the hearsay rule if the declarant is unavailable as a witness."

time that his injuries were fatal. One of the attending physicians did, however, testify that he advised Bejarno that he had small chance of survival.

Bejarno's other dying declaration was made at Valley Medical Center two days prior to his death. Bejarno's voice was inaudible. He responded to questions, however, by nodding his head either affirmatively or negatively. The questioning, by a county investigator, shows that Bejarno was in full possession of his mental faculties. He identified Shuman as his assailant. The extremity of Bejarno's situation was obvious. He was wrapped in gauze from head to foot, immobilized in a special bed, and could not control his shaking.

In *Teeter,* this court said:

> [I]t is not necessary for the declarant to state to anyone, expressly, that he knows or believes he is going to die, or that death is certain or near, or to indulge in any like expression; nor is it deemed essential that his physician, or anyone else, state to the injured person that he will probably die as a result of his wounds, or that they employ any similar expression. It is sufficient if the wounds are of such a nature that the usual or probable effect upon the average person so injured would be mortal; and that such probable mortal effect is not hidden, but, from experience in like cases, it may be *reasonably concluded* that such probable effect has revealed itself upon the human consciousness of the wounded person. . . .

*Id.,* 65 Nev. at 628, 200 P.2d at 679 (emphasis added).

We believe that the probable effect of Bejarno's burns was sufficiently revealed to him and that he knew or strongly believed that his death was imminent. As Professor Wigmore observed: "The circumstances of each case will show whether the requisite consciousness existed; and it is poor policy to disturb the ruling of the trial judge upon the meaning of these circumstances." 5 J. Wigmore, *Evidence* § 1442 at 298–301 (1974). Therefore, we conclude that the dying declarations were properly received.

B.   *The Mandatory Death Sentence.*

It is clear that the imposition of the death penalty does not, in itself, violate the eighth amendment ban on cruel and unusual punishment. Gregg v. Georgia, 428 U.S. 153 (1976). Nor does it violate the similar provision of the Nevada Constitution. Hinrichs v. First Judicial Dist. Court, 71 Nev. 168, 283 P.2d 614 (1955). The question presented by this case is whether such a sentence may constitutionally be imposed upon one

already serving a life sentence without possibility of parole, upon his conviction of the murder of his fellow inmate, under a statute which made the imposition of the death penalty mandatory under such circumstances.

In 1976 the United States Supreme Court, in Gregg v. Georgia, *supra,* and companion Florida and Texas cases,[3] determined that the Georgia, Florida, and Texas death penalties were not in violation of the eighth amendment ban on cruel and unusual punishment, and were not arbitrary and capricious, where the statutes made provision for a bifurcated hearing, first as to guilt and then as to punishment, and where the tribunals, either judge or jury, were required to consider both aggravating and mitigating circumstances. The Court also determined, however, that mandatory death penalty provisions of the statutes of North Carolina and Louisiana were invalid, because the jury had no opportunity to consider the circumstances of the crimes or the background of the accused. Woodson v. North Carolina, 428 U.S. 280 (1976); S. Roberts v. Louisiana, 428 U.S. 325 (1976). In *Woodson,* Justices Stewart, Powell, and Stevens observed that, although individual sentencing determinations generally reflected simply enlightened policy, rather than a constitutional imperative, in capital cases the fundamental respect for humanity underlying the eighth amendment required consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death. 428 U.S. at 304. *Woodson v. North Carolina* and *S. Roberts v. Louisiana* were both cited by the Court one year later, as the Court ruled unconstitutional the mandatory imposition of the death sentence under a statute requiring the death penalty for the killing of a police officer engaged in the performance of his duties, without consideration of the character or background of the accused. H. Roberts v. Louisiana, 431 U.S. 633 (1977).

In each of the cases in which it has ruled the mandatory imposition of the death penalty unconstitutional, however, the Court has specifically *excepted* from its prohibition the circumstances presented by the case at hand. Woodson v. North Carolina, 428 U.S. at 287, n. 7; S. Roberts v. Louisiana, 428 U.S. at 334, n. 9; H. Roberts v. Louisiana, 431 U.S. at 637, n. 5. The Court noted in *S. Roberts v. Louisiana* that a unique problem is presented:

> Only the third category of the Louisiana first-degree murder statute, covering intentional killing by a person

[3]Proffitt v. Florida, 428 U.S. 242 (1976), and Jurek v. Texas, 428 U.S. 262 (1976).

serving a life sentence or by a person previously convicted of an unrelated murder, defines the capital crime at least in significant part in terms of the character or record of the individual offender. Although even this narrow category does not permit the jury to consider possible mitigating factors, a prisoner serving a life sentence presents a unique problem that may justify such a law. [Citations omitted.]

428 U.S. at 334, n. 9.

Although the Court does not explain the "unique" problem, we believe it is clear. Unlike all other situations, in which the question presented to the jury is the degree or nature of punishment that should be imposed, the question presented in this instance, if a separate hearing were required, would be whether any effective punishment should be imposed at all upon a prisoner already serving a life sentence without possibility of parole. What "mitigating circumstances" could be offered that would justify the result that an individual convicted of murder should suffer no practical legal consequences for that deliberate act? It is this circumstance that makes the case "unique".

We note that this would also be the result if, as Shuman urges, we were to declare the statute under which he was sentenced unconstitutional. We do not see "fundamental respect for humanity", Woodson v. North Carolina, 428 U.S. at 304, reflected in the conclusion that the murder of Bejarno should be without effective legal consequences for its perpetrator. In the absence of a clear directive from the United States Supreme Court, we decline to reach such a result.

Therefore, we hold that NRS 200.030(1)(b), as it was in effect when Shuman murdered Bejarno, did not offend the provisions of the United States or the Nevada Contitutions against cruel and unusual punishment, and therefore was constitutional.

### III.

### ISSUES RAISED BY SHUMAN

Shuman requested and received permission to file in proper person supplemental briefs, in which he raised the remaining issues upon which he seeks reversal.

A. *The Effect of Prison Clothes Worn at Trial.*

Shuman wore his prison garb during his trial. He claims that as a result he was prejudiced in his right to a presumption of innocence. He was not prejudiced, for his status as a prisoner

was known to the jury. As the court said in United States ex rel. Stahl v. Henderson, 472 F.2d 556, 557 (5th Cir.), *cert. denied,* 411 U.S. 971 (1973), where the defendant, charged with killing a fellow inmate, was tried in prison clothes: "No prejudice can result from seeing that which is already known." Quoted in Estelle v. Williams, 425 U.S. 501, 507 (1976).

B.   *The Discharge of Counsel's Duties.*

Shuman contends he was denied his sixth amendment right to effective assistance of counsel. The standard by which such a claim may be tested is whether the effectiveness of counsel was such as to reduce the trial to a sham, a farce, or a pretense. Bean v. State, 86 Nev. 80, 465 P.2d 133, *cert. denied,* 400 U.S. 844 (1970). He asserts that his counsel failed to call witnesses who would have placed Shuman away from the scene of the crime and near a television set in another area when Bejarno was set on fire. (His counsel did present several witnesses who testified that Shuman was near the television set sometime before the fire.) There is a presumption that counsel adequately discharged his duties, and that presumption can be overcome only by strong and convincing proof to the contrary. Smithart v. State, 86 Nev. 925, 478 P.2d 576 (1970).

A reading of the record reveals that counsel properly discharged his duties. Such was the ruling of the trial judge in denying Shuman's motion to substitute counsel during his trial: "[I]t is my personal feeling that Mr. Aimar [Shuman's counsel] is doing an excellent job in protecting the rights of the defendant during the prosecution's case . . . Mr. Aimar is doing an excellent job and he is going to continue to do so." We agree.

C.   *Shuman's Guilt Beyond a Reasonable Doubt.*

Shuman also complains that insufficient evidence was presented to the jury to support his conviction of capital murder. Since we have upheld the admissibility of Bejarno's dying declarations, it would serve no purpose to specify the remaining evidence supporting the verdict. Suffice it to say that there is sufficient evidence in the record to support each and every material allegation of the crime and that in such a case the judgment of conviction may not be disturbed on appeal. Wills v. State, 93 Nev. 443, 566 P.2d 1138 (1977).

D.   *Shuman's Representation by Counsel at Prior Proceeding.*

Finally, Shuman seeks reversal because, he claims, the record does not show that he was represented by counsel when

he was convicted of the murder for which he is presently serving a sentence of life without possibility of parole, citing Burgett v. Texas, 389 U.S. 109 (1977).

*Burgett* is inapposite. There, documents admitted into evidence indicated that the defendant was not represented by counsel. The court in *Burgett* said: "In this case the certified records of the Tennessee conviction on their face raise a presumption that petitioner was denied his right to counsel in the Tennessee proceeding . . ." *Id.* at 114.

In the case at hand, no such presumption exists, as the evidence offered by the State was an abstract of judgment showing that Shuman was represented by counsel at the time of imposition of sentence. There was no suggestion that Shuman was not represented by counsel at every critical stage of the prior proceeding. Moreover, Shuman failed to object to this evidence at the time of its admission. This court has held repeatedly that failure to object at trial precludes raising the issue on appeal. *See, e.g.,* Allen v. State, 91 Nev. 78, 530 P.2d 1195 (1975).

Affirmed.[4]

BATJER, C. J., and THOMPSON and GUNDERSON, JJ., concur.

ZENOFF, C. J. (Retired), concurs:

When I assumed duties as a trial judge in 1958, my experience had been that of a lawyer with some criminal matters scattered in a general law practice. I felt then that the death penalty served a purpose. Now, many years later, I do not have the same opinion.

The purposes of imposing penalties upon convicted criminals are to punish, to rehabilitate, or to deter them and others from repeating the offenses in the future. It is questionable that the imposition of death for a capital crime does anything more than punish the criminal for the period of confinement until his life is taken away. The time waiting for execution may be punishing, but once the event takes place, for him it is all over. As a worldly being he suffers no more. So too rehabilitation in a capital case serves no purpose. The murderer will either lose his life or his freedom; either is terminal so far as his living in a free society is concerned.

There might be a deterrence value, but if we only knew. Statistics that the death penalty does or does not discourage capital crime are not reliable. Public figures have been assassinated, their executioners put to death, yet assassinations still occur.

---

[4]The Chief Justice designated Hon. David Zenoff, Chief Justice (Retired), to sit in this case. Nev. Const. art. 6, § 19.

Threat of the death penalty did not reduce airplane hi-jacking; in the long run strict security measures at airports accomplished the purpose. Murders are still committed in the few communities where executions have been carried out.

Public televising of executions might serve some deterring value; yet even supporters of the death penalty shudder at the thought of watching an execution. Killing in exchange for killing does not provide the solution to capital crime.

Life imprisonment without possibility of parole should be our maximum penalty, but the words must mean what they say. Life without freedom is no life at all. Some prisoners prefer death to a life in prison, but to the contrary, of course, it can be argued that life in prison has not been significantly deterring either.

The fact remains that my oath of office requires that I uphold the laws of the State of Nevada as those laws have been defined by the Supreme Court of the United States. Shuman was sentenced to death under a statute that in some part was declared unconstitutional by the United States Supreme Court but not completely. See Smith v. State, 93 Nev. 82, 560 P.2d 158 (1977). In this case, he should have been afforded the bifurcated penalty hearing; still, since Shuman testified at his trial, the jury knew all of the circumstances of the crime. If there was basis for mitigation, he would have gotten it. He does, therefore, fall within the unique situation of a prisoner serving life imprisonment without possibility of parole for one killing who has committed another.

Sentencing Shuman to the same penalty would be useless. Arguably he can be placed in solitary confinement for the rest of his life and deprived of any other prison privileges; but consider the incongruity of severe prison punishment being cruel and inhuman, but taking his life is not.

I do not believe capital punishment has a place in our cultured society, but I must reluctantly concur that the law is as stated in the majority opinion.