**Raymond Wallace SHUMAN, Petitioner-Appellee/Cross-Appellant.**

v.

**Charles L. WOLFF, Jr., Director, Nevada State Prison, et al., Respondents-Appellants/Cross-Appellees,**

**Nos. 83–2392, 83–2459.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 15, 1985.

Decided June 12, 1986.

N. Patrick Flanagan, III, Asst. Federal Public Defender, Reno, Nev., Martin R. Boyers, Las Vegas, Nev., for petitioner-appellee/cross-appellant.

Brooke A. Nielsen, Deputy Atty. Gen., Carson City, Nev., for respondents-appellants/cross-appellees.

Before DUNIWAY, HUG, and SKOPIL, Circuit Judges.

HUG, Circuit Judge:

This appeal and cross-appeal concern the district court's rulings on a petition filed under 28 U.S.C. § 2254 pertaining to two convictions for murder. 571 F.Supp. 213. There are two principal issues. The first concerns the validity of a 1958 conviction of murder that resulted in a sentence of life imprisonment without the possibility of parole. Shuman contends that the conviction was constitutionally infirm because a codefendant's confession was admitted in evidence and thus requires reversal under the Supreme Court's decision in *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). The district court upheld the conviction and Shuman appeals that ruling. The second issue concerns a conviction of murder in 1973. While serving his life sentence, Shuman was convicted in 1973 of the murder of a fellow inmate. The issue raised relating to this conviction is the constitutionality of the Nevada statute in effect in 1973 that provided for a mandatory death sentence for a conviction of murder perpetrated by a person who is under sentence of life imprisonment without the possibility of parole. The district court held the statute unconstitutional and the State of Nevada appeals. We affirm both rulings of the district court.

## I.

### FACTS

In 1958, petitioner Shuman and a codefendant were convicted of first degree murder in the shooting death of a truck driver during a robbery on the roadside of a Nevada highway. The confessions of Shuman and the codefendant revealed that the codefendant shot the truck driver while Shuman remained in the car.

In 1958, the applicable criminal statute, Nev.Rev.Stat. § 200.030 (1957), provided that if the jury found a defendant guilty of murder in the first degree, the jury could fix the penalty at death or life imprisonment, with or without the possibility of parole. The jury, in returning its verdict of guilty of first degree murder, designated the penalty of life imprisonment without the possibility of parole for both defendants.

In 1973, while serving his sentence of life imprisonment without the possibility of parole, Shuman was convicted of "capital murder" for the killing of a fellow prison inmate. The Nevada statute in effect at that time provided for three separate categories of murder: capital murder, murder in the first degree, and murder in the second degree. The mandatory penalty for capital murder was death. On appeal, the Nevada Supreme Court upheld the conviction and the death penalty, after evaluating Shuman's challenge to the constitutionality of the pertinent provisions of the mandatory death penalty statute. *Shuman v. State of Nevada*, 94 Nev. 265, 578 P.2d 1183 (1978).

On July 24, 1978, Shuman filed petitions for habeas corpus and, by mid-1982, had exhausted his state remedies. The federal district court held an evidentiary hearing on the *Bruton* issue on July 8, 1983. At that hearing, the court clerk of the 1958 trial, Martha Barlow, brought to the court the physical evidence of that trial, much of which was introduced into evidence at the hearing through Mrs. Barlow, including Shuman's signed confession, tapes of the codefendant's confession, and Shuman's more detailed confession to the relevant 1958 murder and another murder committed in California a short time before. Although by 1983 Barlow had no independent recollection of what parts of the tapes had been played, with the help of notes she had written during the trial on transcripts of the tapes, she was able to identify those portions of the tapes that were played for the jury in 1958. Barlow also informed the court of the unavailability of any trial transcript. One court reporter had destroyed

his notes prior to 1966 and the other had retired sometime prior to 1978 and could not be located. The district court rejected the *Bruton* contention based on harmless error, but vacated the death sentence, finding it unconstitutional because it was mandatory.

## II.

### THE ALLEGED BRUTON ERROR

Shuman challenges the admission during his 1958 murder trial of the out-of-court confession of his codefendant, Melvin Lee Rowland, which implicated Shuman. In *Bruton v. United States*, 391 U.S. 123, 137, 88 S.Ct. 1620, 1628, 20 L.Ed.2d 476 (1968), the Supreme Court held that introduction of such extrajudicial statements violates the defendant's right of confrontation secured by the confrontation clause of the sixth amendment and that cautionary limiting instructions that the confession is evidence only against the confessing defendant, such as those given by the state trial court, do not remedy the deprivation of the right to confrontation. *Bruton* applies retroactively. *Roberts v. Russell*, 392 U.S. 293, 293, 88 S.Ct. 1921, 1921, 20 L.Ed.2d 1100 (1968). The district court concluded that the admission of Rowland's confession constituted *Bruton* error, but that the error was harmless beyond a reasonable doubt. The Supreme Court has held that a *Bruton* error is not reversible error if it can be shown that it was harmless beyond a reasonable doubt. *Harrington v. California*, 395 U.S. 250, 253–54, 89 S.Ct. 1726, 1728, 23 L.Ed.2d 284 (1969).

The district court was initially confronted with the problem that the trial transcripts no longer exist; however, the court clerk from the 1958 trial, Martha Barlow, presented the court with exhibits considered by the jury, including a three-page signed confession of Shuman, three tapes of Shuman's two-day-long oral confession, and tapes of codefendant Rowland's confession. The clerk testified as to which parts of the tapes the jury heard based on contemporaneous notes she had made on

the ninety-page transcript of the tapes.[1] The district court found that the confession,

> even with the excisions made, furnishes a detailed and complete account of the murder of which petitioner was convicted at his 1958 trial. The confession of Marvin Lee Rowland, although not quite as detailed as petitioner's confession, and even with excisions made in it, also gives a complete account of the same murder. Both confessions as received in evidence are in agreement with one another and interlock. There are no material conflicts between the two as to any element of the murder. It is readily apparent from a reading of petitioner's confession that that confession alone provided more than a sufficient basis for his conviction.

See *Parker v. Randolph*, 442 U.S. 62, 73, 99 S.Ct. 2132, 2139, 60 L.Ed.2d 713 (1979) (error harmless where "the incriminated defendant has corroborated his codefendant's statement by heaping blame onto himself").

■ Shuman disputes the admissibility of Mrs. Barlow's testimony, arguing that Mrs. Barlow had no independent recollection of which portions of the taped confessions were played.[2] Her testimony was based largely upon the notes she had made during the trial on the transcripts of the tapes. Such evidence is admissible under Fed.R.Evid. 803(5) since Mrs. Barlow adequately testified to the three foundational elements: (1) that she had once had the knowledge but, by the time of the hearing, had insufficient recollection to enable her to testify fully and accurately, (2) that the notes were made when the matter was fresh in her memory, and (3) that the notes correctly reflected that knowledge. Further, this objection to the admissibility of this evidence is inconsistent since Shuman must rely on Mrs. Barlow's notes to press his *Bruton* claim concerning the introduction of codefendant Rowland's confession.

■ We agree with the district court that the erroneous admission of Rowland's confession was harmless beyond a reasonable doubt under the standards of *Harrington v. California*, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1968), and *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

### III.

### THE MANDATORY DEATH PENALTY

We now turn to consideration of the State of Nevada's cross-appeal of the district court's holding that the statute under which Shuman was sentenced is constitutionally infirm because of its mandatory nature. The applicable statute in effect at the time of Shuman's 1976 conviction, Nev. Rev.Stat. § 200.030 (1973), provided in pertinent part:

> 1. Capital murder is murder which is perpetrated by:
>
> . . . .
>
> b. A person who is under sentence of life imprisonment without possibility of parole.
>
> . . . .
>
> 5. Every person convicted of capital murder shall be punished by death.[3]

The Nevada Supreme Court in *Shuman v. State*, 94 Nev. 265, 578 P.2d 1183 (1978),

---

1. Portions of Shuman's confession relating to another murder in California were not played to the jury.

2. Shuman's 1958 trial counsel had objected to admission of the Rowland confession, but a tactical decision was made not to take a direct appeal because, according to a 1978 affidavit of the 1958 defense counsel, the 1958 trial was considered a victory. The death sentence had been avoided, and any retrial would again subject Shuman to a possible death sentence. According to counsel, Shuman also would have had to face another murder charge, and a possi-

ble death sentence in California, had he not been convicted for the 1958 Nevada slaying.

3. The offenses included within the definition of capital murder were: (a) killing a peace officer or fireman while he was acting in his official capacity, (b) murder perpetrated by a person under sentence of life imprisonment without parole, (c) executing a contract to kill, (d) use or detonation of a bomb or explosive device, (e) killing more than one person willfully as the result of a single plan, scheme, or device. Nev. Rev.Stat. § 200.030(1)(a)-(e) (1973).

upheld the constitutionality of this mandatory death penalty provision even though it had earlier declared the mandatory death penalty provision of another subsection of Nev.Rev.Stat. § 200.030 to be in violation of the eighth and fourteenth amendments of the United States Constitution.[4] The Nevada Supreme Court noted that although the constitutionality of mandatory death sentences had been generally rejected by the Supreme Court, the Court had specifically excepted from its holding and expressed no opinion on the application of a mandatory death sentence to a conviction of murder by a person serving a life sentence. *Shuman v. State*, 94 Nev. at 270–71, 578 P.2d at 1186–87.

The Nevada Supreme Court was quite correct that we are here dealing with the exact circumstance for which the Supreme Court specifically reserved judgment. The district court had, and this court has, the advantage of some additional decisions of the Supreme Court that shed light on the issue that were not available to the Nevada Supreme Court at the time of its decision. The district court, in a carefully reasoned decision, concluded that the recent opinion of the Supreme Court in *Eddings v. Oklahoma*, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982), made apparent its disdain for the mandatory death penalty in general and that the reasons there expressed would apply as well in the circumstances of a murder committed by a person serving a life sentence.

A review of the evolving position of the United States Supreme Court with regard to the death penalty is instructive in making the determination in this case. In *Fur-*

*man v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), the Supreme Court rendered a 5-to-4 decision that, in effect, invalidated the death penalty statutes in all jurisdictions in the United States. In that case, there were nine separate opinions, with each justice expressing his specific reasons for concurring with or dissenting from a brief per curiam opinion. For the majority, Justices Brennen and Marshall concluded that the eighth amendment prohibited the death penalty in all circumstances *id.* at 305, 370–71, 92 S.Ct. at 2760, 2793–94. Justices Douglas, Stewart, and White each had a somewhat different rationale, but basically objected to the arbitrary and discriminatory manner in which it was administered because of the wide discretion left to juries to impose or not to impose a death sentence. Justice Douglas left open the possibility that mandatory death penalties could be constitutional. *Id.* at 256–57, 309–10, 313–14, 92 S.Ct. at 2735–36, 2762–63, 2764–65.

The response from state legislatures took two approaches. Some limited the discretion of juries by prescribing guidelines that the jury or sentencing judge must consider in determining whether to fix the sentence at death or life imprisonment. The other approach was to provide for mandatory death sentences for certain narrowly-defined crimes.

In 1976, the Court considered five death penalty cases in which it upheld the guideline approach and rejected the mandatory death sentence approach. The guideline approach was upheld in *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859

**4.** The Nevada Supreme Court in *Smith v. State*, 93 Nev. 82, 560 P.2d 158 (1977) held unconstitutional the mandatory death penalty prescribed in Nev.Rev.Stat. § 200.030(5) as it applied to Nev.Rev.Stat. § 200.030(1)(e), (the killing of more than one person as the result of a single plan, scheme, or device), based on the United States Supreme Court's decisions in *Woodson v. North Carolina*, 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976) and *Roberts (Stanislaus) v. Louisiana*, 428 U.S. 325, 96 S.Ct. 3001, 49 L.Ed.2d 974 (1976).

The portion of Nev.Rev.Stat. § 200.030, which provided for "capital murder" and mandated the

death penalty for conviction of that offense, has since been repealed. The present statute provides that a person convicted of first degree murder shall be punished by death "only if one or more aggravating circumstances are found and any mitigating circumstance or circumstances which are found do not outweigh the aggravating circumstance or circumstances." Nev.Rev.Stat. § 200.030(4)(a) (enacted in 1977). The only aggravating circumstances to be considered are set forth in Nev.Rev.Stat. § 200.033 and a non-exclusive list of mitigating circumstances are set forth in Nev.Rev.Stat. § 200.035.

(1976); *Proffitt v. Florida,* 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976); and *Jurek v. Texas,* 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976). The mandatory sentencing approach was rejected in *Woodson v. North Carolina,* 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976) and *Roberts (Stanislaus) v. Louisiana,* 428 U.S. 325, 96 S.Ct. 3001, 49 L.Ed.2d 974 (1976), each decided in a 5-to-4 decision. Again, Justices Brennen and Marshall concluded that the death penalty was unconstitutional per se. A three-judge plurality, composed of Justices Stewart, Powell, and Stevens, concluded that the mandatory application of the penalty, without consideration of the individual offense and the character and record of the offender, rendered the statutes violative of the eighth and fourteenth amendments. Justices Burger, White, Blackmun, and Rehnquist dissented.

The plurality opinion in *Woodson* pointed out that, at the time the eighth amendment was adopted, the states uniformly followed the common law practice of mandatory death sentences for certain specific crimes, but that the harshness of the application of these penalties had resulted in reforms allowing more flexibility in providing for the discretion of the jury to impose or not to impose the death penalty. *Woodson,* 428 U.S. at 289–98, 96 S.Ct. at 2984–88. The opinion concluded that, because of the vast qualitative difference between a sentence of death and one of imprisonment, there is greater need for reliability before imposing a death sentence and that "in capital cases the fundamental respect for humanity underlying the Eighth Amendment … requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death." *Woodson,* 428 U.S. at 304, 96 S.Ct. at 2991 (citations omitted). The same plurality reemphasized this rationale in *Roberts (Stanislaus),* decided the same day. 428 U.S. at 333–36, 96 S.Ct. at 3006–07.

In a subsequent opinion *Roberts (Harry) v. Louisiana,* 431 U.S. 633, 97 S.Ct. 1993, 52 L.Ed.2d 637 (1977), the same five-judge majority struck down the mandatory death penalty and confirmed the rationale expressed in the *Woodson* and *Roberts (Stanislaus)* decisions. *Id.* at 636–37, 97 S.Ct. at 1995–96. The same four justices dissented. In each of these cases, the controlling opinions had specifically indicated that no opinion was being expressed on the constitutionality of a mandatory sentence for a murder committed by a person serving a life sentence. *Woodson,* 428 U.S. at 287, n. 7 and 292–93 n. 25, 96 S.Ct. at 2983 n. 7 and 2985 n. 25; *Roberts (Stanislaus),* 428 U.S. at 334 n. 9, 96 S.Ct. at 3006 n. 9; *Roberts (Harry),* 428 U.S. at 637 n. 5, 97 S.Ct. at 1995 n. 5.

In *Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), Chief Justice Burger sought to extract the governing principles enumerated by the Court's various opinions for the guidance of the lower courts, stating:

> In the last decade, many of the States have been obliged to revise their death penalty statutes in response to the various opinions supporting the judgments in *Furman* and *Gregg* and its companion cases. The signals from this Court have not, however, always been easy to decipher. The States now deserve the clearest guidance that the Court can provide; we have an obligation to reconcile previously differing views in order to provide that guidance.

*Id.* at 602, 98 S.Ct. at 2963. The Court struck down a death penalty statute limiting the mitigating circumstances the sentencing judge could consider. Three justices concurred with the Chief Justice in the opinion (Justices Stewart, Powell, and Stevens). Justices White and Blackmun concurred in the judgment on a narrower ground; Justice Marshall again stressed his view that the death penalty was unconstitutional per se; Justice Rehnquist dissented; and Justice Brennen did not participate in the decision. The opinion of the Chief Justice stated:

> We are now faced with those questions and we conclude that the Eighth and

Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case,[11] not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.[12]

---

[11] We express no opinion as to whether the need to deter certain kinds of homicide would justify a mandatory death sentence as, for example, when a prisoner—or escapee—under a life sentence is found guilty of murder. *See Roberts (Harry) v. Louisiana,* 431 U.S. 633, 637 n. 5 [97 S.Ct. 1993, 1995 n. 5, 52 L.Ed.2d 637] (1977).

[12] Nothing in this opinion limits the traditional authority of a court to exclude, as irrelevant, evidence not bearing on the defendant's character, prior record, or the circumstances of his offense.

*Id.* at 604, 98 S.Ct. at 2964 (emphasis in original). As can be seen from note 11 in the above quotation, the Court still reserved any expression of opinion on the question at issue in this case.

A more recent pronouncement of the Court bearing on the issue is *Eddings v. Oklahoma,* 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982). In a 5–to–4 decision, the Court vacated a death sentence where the trial judge had believed he was constrained from considering the age and turbulent family background of the defendant and remanded for the state courts to consider "all relevant mitigating evidence and weigh it against the evidence of the aggravating circumstances." *Id.* at 113–17, 102 S.Ct. at 876–78. The opinion of Justice Powell, in which Justices Brennen, Marshall, Stevens, and O'Connor concurred, relied on the standard stated in *Lockett.* The dissent written by Justice Burger and concurred in by Justices White, Blackmun, and Rehnquist, agreed that *Lockett* provided the appropriate standard but disagreed with its applica-

**5.** In Supreme Court cases dealing with similar capital punishment issues since *Eddings,* none have concerned the specific issue here involved, but it is evident that the continuing emphasis is on individualized consideration of the offender and his crime. In none of these cases that quoted the standards of *Lockett* and *Woodson*

tion in that case. *Id.* at 121–26, 102 S.Ct. at 880–83.

It is apparent that the standard set forth in *Lockett* is to be applied in death penalty cases. Justice Powell's opinion quoted the passage from *Lockett* previously quoted herein, but modified it in a way that is significant in this case. The opinion states:

In *Lockett v. Ohio,* 438 U.S. 586 [98 S.Ct. 2954, 57 L.Ed.2d 973] (1978), CHIEF JUSTICE BURGER, writing for the plurality, stated the rule that we apply today:

[W]e conclude that the Eighth and Fourteenth Amendments require that the sentencer ... not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death. *Id.* at 604 [98 S.Ct. at 2964] (emphasis in original).

*Eddings,* 455 U.S. at 110, 102 S.Ct. at 874 (footnote omitted). We note that the rule applied by Justice Powell eliminates the phrase, "in all but the rarest kind of capital case," and also eliminates any reference to footnote 11 of the *Lockett* opinion that reserves judgment on the situation of a murder committed by a person under a life sentence. The specific elimination of the phrase from the quotation gives some indication that the Court intended to eliminate the reservation concerning the person serving a life sentence as set forth in footnote 11 of the *Lockett* decision.

However, because that situation was not discussed in *Eddings* and the facts of the case did not present that situation, we will proceed to discuss the application of the *Lockett* standard to that area reserved by the footnotes in *Woodson, Roberts (Stanislaus), Roberts (Harry),* and *Lockett.*[5]

has there been any reference to a reservation of opinion concerning a murder committed by a person serving a life sentence. *See Skipper v. South Carolina,* 106 S.Ct. 270, 88 L.Ed.2d 225 (1986); *Baldwin v. Alabama,* —— U.S. ——, 105 S.Ct. 2727, 86 L.Ed.2d 300 (1985); *California v. Ramos,* 463 U.S. 992, 103 S.Ct. 3446, 77 L.Ed.2d

There appear to be two reasons why the opinions reserved judgment in this area. The first is that the character or record of a prisoner serving a life sentence is adequately evident from the fact he has been given a life sentence. This was the rationale stated in *Woodson*.[6] Under this rationale, it is unnecessary to consider mitigating circumstances because Shuman's bad character and record are adequately established from the fact he is serving a life sentence. With the evolvement of the Supreme Court's view, as expressed in *Lockett* and *Eddings*, it seems readily apparent that this earlier rationale could not be applied consistent with those opinions.

The difficulties are evident in the application of the relevant Nevada statutes. At the time Shuman was convicted of the second murder in 1973, a person could have been serving a life sentence without the possibility of parole for numerous offenses. At the time of his 1958 conviction, the applicable Nevada statute authorized a sentence of life imprisonment without the possibility of parole for the following offenses:

All murder which shall be perpetrated by means of poison, or lying in wait, torture, or by any other kind of willful, deliberate and premeditated killing, or which shall be committed in the perpetration, or attempt to perpetrate, any arson, rape, robbery or burglary, or which shall be committed by a convict in the state prison serving a sentence of life imprisonment. . . .

Nev.Rev.Stat. § 200.030(1) (1957). Thus, a sentence of life imprisonment without the possibility of parole could have resulted from conduct such as a killing by an accomplice in an attempted burglary or it could have resulted from conduct as aggravated as a torture murder. Furthermore, the consideration of other relevant circumstances would be eliminated, such as the age and the mental or emotional state of the defendant, the provocation for the killing, the pressure from other inmates, and the record of the defendant in prison since the first offense.

It would appear that this reason for the reservation was dropped by the Court in *Lockett* because a different reason was there advanced. The expressed possible reason was the need to deter certain kinds of homicide.[7] However, the deterrent effect of capital punishment to the person serving a life sentence still exists under statutes that give individualized consideration to the nature of the offense and the circumstances of the offender, such as the statute in *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), and in the current Nevada statute, Nev.Rev.Stat. §§ 200.030–35.[8] The argument that the death penalty is a necessary deterrent to a person serving a sentence of life imprisonment without the possibility of parole because another such sentence would constitute no deterrent, is more logically concerned with the question of whether there should be a death penalty at all, rather than whether the penalty should be mandatory. *See People v. Smith*, 63 N.Y.2d 41, 479 N.Y.S.2d 706, 724, 468 N.E.2d 879, 897 (N.Y.1984), *cert. denied*, —— U.S. ——, 105 S.Ct. 1226, 84 L.Ed.2d 364 (1985). As the district court aptly noted, "the availability

---

1171 (1983); *Barclay v. Florida,* 463 U.S. 939, 103 S.Ct. 3418, 77 L.Ed.2d 1134 (1983); *Zant v. Stephens,* 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983).

**6.** The *Woodson* reservation provides:

This case does not involve a mandatory death penalty statute limited to an extremely narrow category of homicide, such as murder by a prisoner serving a life sentence, defined in large part in terms of the character or record of the offender. We thus express no opinion regarding the constitutionality of such a statute.

*Woodson,* 428 U.S. at 287 n. 7, 96 S.Ct. at 2983 n. 6.

**7.** The opinion of the Court stated:

We express no opinion as to whether the need to deter certain kinds of homicide would justify a mandatory death sentence as, for example, when a prisoner—or escapee—under a life sentence is found guilty of murder. *See Roberts (Harry) v. Louisiana,* 431 U.S. 633, 637 n. 5 [97 S.Ct. 1993, 1995 n. 5] (1977). *Lockett,* 438 at 604 n. 11, 98 S.Ct. at 2964 n. 11.

**8.** *See* note 4, *supra.*

796

of the death penalty for the prisoner serving a life term without the possibility of parole is a sufficient deterrent, while making mandatory such a sentence under those circumstances only serves to give the imposition of the death sentence the air of arbitrariness and caprice."

We agree with analysis of the well-reasoned opinion of the Court of Appeals of New York in concluding under similar, though distinguishable circumstances, that "a mandatory death statute simply cannot be reconciled with the scrupulous care the legal system demands to insure that the death penalty fits the individual and the crime." *Smith*, 468 N.E.2d at 897, 479 N.Y.S.2d at 724. Though the Supreme Court had earlier reserved its opinion concerning a person convicted of murder who was serving a life sentence, the reasons expressed in the opinions generally rejecting the mandatory death statutes are applicable as well in that circumstance. We suggest that this is the reason why that reservation was not restated in *Eddings*.

## IV.

### CONCLUSION

■ We conclude that the provision of the Nevada Revised Statutes providing for a mandatory death penalty for a person who is under a sentence of life imprisonment without the possibility of parole, under which Shuman was sentenced in 1978, violated the eighth and fourteenth amendments to the United States Constitution. We therefore affirm the district court's grant of the petition for habeas corpus relief from the imposition of the death sentence.

We also affirm the denial of Shuman's petition for relief from the 1958 conviction. While it was *Bruton* error to admit the confession of codefendant Rowland, this error was harmless beyond a reasonable doubt in light of Shuman's own confession.

AFFIRMED.